---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

MANUEL MORENO,

*Plaintiff-Appellant,*

v.

CAROL BOSHOLM,

*Defendant-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
The Honorable Loretta C. Biggs

---

## PLAINTIFF-APPELLANT'S OPENING BRIEF

---

James W. Whalen
Sam J. Ervin, IV
BROOKS, PIERCE, MCLENDON,
 HUMPHREY & LEONARD, L.L.P.
P.O. Box 1800
Raleigh, NC 27602
Telephone: (919) 839-0300
Fax: (919) 839-0304

*Attorneys for Plaintiff-Appellant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................... ii

INTRODUCTION ......................................................................1

JURISDICTION......................................................................3

QUESTIONS PRESENTED ON APPEAL...............................3

STATEMENT OF THE CASE.................................................4

    A. Mr. Moreno presents with flu-like symptoms.........................4

    B. Mr. Moreno struggles to breath; his oxygen level plummets and becomes life-threatening. .................................6

PROCEDURAL HISTORY ......................................................9

STANDARD OF REVIEW .......................................................12

    I. Exclusion of Expert Testimony....................................12

    II. Judgment as a Matter of Law.....................................13

SUMMARY OF THE ARGUMENT........................................13

ARGUMENT ...........................................................................15

    I. The District Court Erred By Limiting Dr. Bilbro's Testimony. .15

    A. The district court erred by applying state evidentiary rules. .................................................15

    B. The district court's error was not harmless. .........................17

    III. The District Court Erred in Granting Judgment As A Matter of Law.............................................................22

    A. A reasonable jury could have concluded that Dr. Bosholm's wholly inadequate response to Mr. Moreno's serious medical condition constituted deliberate indifference...........23

    B. A reasonable jury could have concluded that Dr. Bosholm acted with gross negligence. ...................................29

CONCLUSION.........................................................................31

REQUEST FOR ORAL ARGUMENT ....................................31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

4861-6412-4818.v8

# TABLE OF AUTHORITIES

Page(s)

Cases

*Belville v. Ford Motor Co.*,
  919 F.3d 224 (4th Cir. 2019) ............................................................12
*Cooter & Gell v. Hartmarx Corp.*,
  496 U.S. 384 (1990) ...........................................................................12
*Cox v. Quinn*,
  828 F.3d 227 (4th Cir. 2016) .......................................................23, 25
*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ...........................................................................16
*Estelle v. Gamble*,
  429 U.S. 97 (1976) .............................................................................23
*F.D.I.C. ex rel. Coop. Bank v. Rippy*,
  799 F.3d 301 (4th Cir. 2015) (applying North Carolina law) ............30
*Farmer v. Brennan*,
  511 U.S. 825 (1994) .......................................................................22–25
*Griffin v. Blankenship*,
  248 N.C. 81, 102 S.E.2d 451 (1958) ..................................................29
*Hanna v. Plumer*,
  380 U.S. 460 (1965) ...........................................................................16
*Helling v. McKinney*,
  509 U.S. 25 (1993) .............................................................................23
*Iko v. Shreve*,
  535 F.3d 225 (4th Cir. 2008) .............................................................23
*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod.*
  *Liab. Litig. (No II)*,
  892 F.3d 624 (4th Cir. 2018) .............................................................18
*Krizak v. W.C. Brooks & Sons, Inc.*,
  320 F.2d 37 (4th Cir. 1963) ...............................................................16
*Mathis v. Terra Renewal Servs., Inc.*,
  69 F.4th 236 (4th Cir. 2023) ..............................................................13
*Ray v. N.C. Dep't of Transp.*,
  366 N.C. 1, 727 S.E.2d 675 (2012) ....................................................30
*Sardis v. Overhead Door Corp.*,
  10 F.4th 268 (4th Cir. 2021).........................................................12, 17
*Sarkees v. E. I. DuPont de Nemours & Co.*,
  15 F.4th 584 (2d Cir. 2021) ...............................................................16
*Scinto v. Stansberry*,
  841 F.3d 219 (2016) ...................................................................16, 23–26
*Scott v. Sears, Roebuck & Co.*,
  789 F.2d 1052 (4th Cir. 1986) ...........................................................16

4861-6412-4818.v8

*Smith v. Stepp,*
  257 N.C. 422, 125 S.E.2d 903 (1962) ....................................................30
*Smith v. Whitmer,*
  159 N.C. App. 192, 582 S.E.2d 669 (2003) ...........................................15
*Turner v. Duke Univ.,*
  325 N.C. 152, 381 S.E.2d 706 (1989) .............................................22, 29
*Weatherford v. Glassman,*
  129 N.C. App. 618, 500 S.E.2d 466 (1998) ..........................................29

## Statutes

28 U.S.C. § 1291 ..........................................................................................3
28 U.S.C. § 1331 ..........................................................................................3
28 U.S.C. § 1367 ..........................................................................................3
42 U.S.C. § 1983 ...................................................................................3, 10
N.C. Gen. Stat. § 90-21.12(a) ..................................................................29

## Rules

Fed. R. App. P. 4(a)(1)(A) .........................................................................1
Fed. R. App. P. 28.1(e)(2)(A)(i) ................................................................1
Fed. R. Civ. P. 50(a)(1) ............................................................................13
Fed. R. Evid. 702 ................................................................................16–18
N.C. R. Civ. P. 702(b) ..............................................................................15
N.C. R. Evid. 702(b) .................................................................................15

4861-6412-4818.v8

# INTRODUCTION

Manuel Moreno nearly died from inadequate medical treatment he received while a prisoner at Scotland Correctional Institution in February 2016. He was quarantined with the flu on a Friday evening and largely ignored throughout the weekend. Slowly, influenza gripped his lungs, making it difficult to breath and preventing him from inhaling enough oxygen. By Monday morning, his blood-oxygen level had cratered. His brain and other vital organs were not receiving enough oxygen to function. He vomited, suffered a seizure, and fell into a weeks-long coma. When he finally awoke, his memory was so distorted that he could not recognize his own mother. He has suffered lasting damage to his kidneys, pancreas, liver, eyesight, and mobility, and is now relegated to a wheelchair. His post-release plan to move home to Mexico and care for his aging parents has vanished. Although he narrowly escaped death in 2016, he now feels as though his life is over.

All of Mr. Moreno's injuries were easily preventable. The appropriate way to care for a flu patient in any setting is to count his rate of breath, listen to his lungs through a stethoscope for crackles or "rales," and measure his blood's oxygen content by briefly attaching a small pulse oximeter to his fingertip or toe. Regular monitoring allows the provider to ensure that the patient's condition does not deteriorate too far before receiving appropriate treatment, such as an oxygen infusion.

Unfortunately, Mr. Moreno's doctor did not take even the most minimal steps to ensure that his condition would be properly monitored. Late on Friday evening, Dr. Carol C. Bosholm—a contract physician at the prison—received Mr. Moreno's chart as part of a sudden deluge of thirty-five flu patients. Without ever evaluating

Mr. Moreno, Dr. Bosholm ordered that he be quarantined with flu patients, "signed off" on his chart, and signed out for the weekend. She did not order a flu test or diagnose him with the flu. She did not prescribe him any medicine to treat the flu. She left no instructions to the nursing staff to listen to his lungs, monitor his breath rate, or measure his blood-oxygen content, despite subjectively knowing that without such instruction, the nurses would not do so. She did not check in over the weekend or on Monday morning when she returned to work. As a consequence, no one meaningfully monitored Mr. Moreno's condition, and he nearly died.

Mr. Moreno sued Dr. Bosholm for deliberate indifference in violation of his federal civil rights and state law negligence and gross negligence. At trial, he sought to introduce expert testimony to establish that Dr. Bosholm's inaction constituted a breach of the standard of care and caused Mr. Moreno's injuries. Relying on state evidence rules, the district court excluded this testimony. Then, because Mr. Moreno had not produced sufficient expert testimony to support his claims, the district court granted judgment as a matter of law in favor of Dr. Bosholm and dismissed Mr. Moreno's case.

The district court erred. Federal law, not state evidentiary rules, controls whether expert testimony is admissible in federal court. This expert testimony was critical to Mr. Moreno's case, and its exclusion was a determining factor in the district court's judgment. Mr. Moreno is therefore entitled to a new trial.

Moreover, even without this excluded testimony, Mr. Moreno still produced sufficient evidence from which the jury could have reasonably found Dr. Bosholm

4861-6412-4818.v8

liable. The admitted evidence—taken in the light most favorable to Mr. Moreno—shows that Dr. Bosholm failed to order that his respiration and blood-oxygen level be meaningfully monitored despite knowing that her failure to do so posed a serious risk to Mr. Moreno's health. Thus, the district court erred in awarding judgment as a matter of law.

Mr. Moreno therefore respectfully requests that the district court's judgment be vacated and his case remanded for a new trial.

## JURISDICTION

This is an appeal from a final judgment entered in the United States District Court for the Middle District of North Carolina. JA533. The district court had federal question jurisdiction over Mr. Moreno's deliberate indifference claim pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 and had supplemental jurisdiction over Mr. Moreno's negligence and gross negligence claim pursuant to 28 U.S.C. § 1367. This Court has jurisdiction from the final decision of the district court granting Dr. Bosholm's motion for judgment as a matter of law, which resolved all of Mr. Moreno's remaining claims, pursuant to 28 U.S.C. § 1291. Mr. Moreno filed this appeal on September 2, 2023, within 30 days of the District Court's judgment as required by Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure.

## QUESTIONS PRESENTED ON APPEAL

I.  Did the District Court err by applying state evidentiary rules to limit the testimony of Mr. Moreno's expert witness when federal rules of evidence, not state rules, apply in federal court?

II.    Did the District Court err by granting Dr. Bosholm's motion for judgment as a matter of law when sufficient evidence presented to the jury supported Mr. Moreno's claims for deliberate indifference and gross negligence?

## STATEMENT OF THE CASE

### A. Mr. Moreno presents with flu-like symptoms.

One hour before a shift change on Friday, February 26, 2016, at 5:00 p.m., Manuel Moreno and thirty-four other inmates were delivered to Scotland Correctional Institution's medical center with flu-like symptoms. JA366:16–20; 367:18–21, JA436:21–24; *see* JA345:17–24. At 41 years old, Mr. Moreno had until then been in good health. JA297:12–18, 377:17–18. On February 26, he had a sore throat, body aches, and sinus pain and pressure, and was coughing up green sputum. JA:328:20–24.

The prison's lead nurse, Heather Sullivan, was quickly overwhelmed by the number of new patients. *See* JA376:11–19. She began screening the patients and called for assistance. JA366:23–25, 376:11–19.

Ms. Sullivan evaluated Mr. Moreno and jotted her notes down on his chart. JA367:1–3. She measured his temperature, rate of breath, and blood-oxygen content. JA290:9–22. According to Ms. Sullivan's notes, Mr. Moreno's temperature and oxygen level were in the normal range; however, his breathing was abnormally rapid, indicating respiratory distress. JA290:9–22. Ms. Sullivan's notes do not indicate that she listened to his lungs. JA290:6–8, JA440:14–16.

Although Ms. Sullivan evaluated Mr. Moreno, her ability to treat him was severely limited. JA376:11–19. She could not diagnose or, in her words, "do anything"

beyond a simple evaluation. *Id.* Accordingly, she requested a review by the prison's physician, Dr. Carol Bosholm. *Id.*

Dr. Bosholm is a licensed physician and is board certified in internal medicine. JA266:23–267:3. In February 2016, she was working as a *locum tenens* general internist physician for Scotland Correctional. JA434:25–435:3, 435:18. As a contract physician, Dr. Bosholm only worked at the prison during business hours. JA435:18–436:6. Dr. Bosholm was moments away from leaving for the weekend when Ms. Sullivan requested her assistance. *See* JA436:21–24, 443:14–17.

Shortly after Ms. Sullivan evaluated Mr. Moreno, Dr. Bosholm joined Ms. Sullivan to evaluate the remaining patients. JA373:11–14, 450:7–8. She then stayed to review the charts of the patients that Ms. Sullivan had seen before she arrived. Among these was Mr. Moreno's chart. JA449:9. Dr. Bosholm read that he had flu-like symptoms and suspected that he had the flu. JA451:17–18. She quarantined him in "close proximity" with eighteen other individuals suspected of having the flu, including four patients with confirmed cases. JA327:5–8, 332:10–12, 333:4–5, 334:1–3. She did not diagnose Mr. Moreno with the flu or order that he receive a flu test. Instead, she diagnosed him with a sore throat—called "acute pharyngitis"—and prescribed antibiotics. JA280:19–22, 281:16–24.

Dr. Bosholm did not examine Mr. Moreno personally or request any additional information. JA276:8–12, 280:10–14, 438:12. She "made her diagnosis, judgment, and disposition" based solely on Ms. Sullivan's notes. *Id.* Dr. Bosholm then "initiated quarantine, gave guidance to the nurses on what was expected over the weekend with

4861-6412-4818.v8

each of those patients while they were on quarantine," and "communicated that to the nurse supervisor." JA427:23–428:5. This guidance served as Mr. Moreno's treatment "plan." *See* JA467:15.

Dr. Bosholm knew that nurses carefully considered her guidance in carrying out treatment plans. JA470:20–24. However, her "guidance" in this case did not include any instruction to monitor Mr. Moreno's respiration. JA281:22–24, 450:25–451:3. She did not instruct anyone to measure his rate of breath, listen to his lungs, or monitor his blood's oxygen content, even though his chart showed that he was breathing abnormally rapidly and that no one had yet listened to his lungs. *Id.* Doctors' orders included nothing but a prescription for an antibiotic—designed to treat a possible infection, not the flu. *Id.*

Dr. Bosholm then "signed off" on Mr. Moreno's chart and left for the weekend. JA438:2–3, 443:14–17. Although she was permitted to do so, she did not check in on him or any other patient at any point during the weekend. JA424:6–7.

## B. Mr. Moreno struggles to breath; his oxygen level plummets and becomes life-threatening.

A properly working respiratory system is remarkably complex. Membranes in the lungs extract much-needed oxygen from the air. Red blood cells carry these oxygen molecules throughout the body to vital organs, muscles, and—most importantly—the brain.[1]

---

[1] Rebecca Dezube, *Exchanging Oxygen and Carbon Dioxide*, Merck Manual (2023), https://www.merckmanuals.com/home/lung-and-airway-disorders/biology-of-the-lungs-and-airways/exchanging-oxygen-and-carbon-dioxide.

4861-6412-4818.v8

Respiratory viruses like the flu disrupt this system. Phlegm in the lungs makes it difficult for the victim to draw in enough oxygen in each breath. Blood cells leave the lungs empty handed. Lips and fingernails turn blue. Vital organs—the brain, kidneys, liver, muscles, and more—suffocate. They begin to shut down. *See* JA288:21–289:3; JA488:17–490:6.

Mr. Moreno entered quarantine with eighteen other inmates on Friday, February 26. JA282:2–4. Nurses checked his temperature on February 27, 28, and 29, in accordance with the prison's quarantine protocol. JA447:11–12. These nurse visits were exceptionally brief. On at least one occasion, the nurse spent a total ten minutes with nineteen prisoners—approximately thirty seconds per prisoner. JA351:5–14.

Nurses did not check Mr. Moreno's respiration at any time between February 26 and afternoon on February 29. JA282:8–11, 346:7–13, 350:5–15, 351:2–14. They did not listen to his lungs, measure his breathing, or test his blood-oxygen level. JA282:8–11, 282:25–283:2, 363:4–9. They certainly could have—all three actions are routine and can be quickly done in the prison cell. JA288:10–12. They are also critically important: Listening to a flu patient's lungs is the only way a provider can assess whether the patient has "rales"—a crackling in the lungs that indicates the patient is struggling to breath. JA289:17–25. A pulse oxygen monitor—a small device briefly attached to the patient's finger or toe—is a simple way to see if the blood is carrying enough oxygen throughout the body. JA288:10–12.

4861-6412-4818.v8

The nurses failed to take these steps because no one told them to take them. Dr. Bosholm had left no instructions, and although she was "aware" of the prison's nursing protocols, there is no evidence that the prison's quarantine protocol required nurses to check patients' respiration. JA447:15–16, 451:5–6.

On Sunday, February 28, Mr. Moreno complained of difficulty breathing. JA287:11–12, 304:21–305:6, 308:11–15. The quarantine was lifted on Monday, February 29, and Mr. Moreno was again evaluated by a nurse practitioner. His pulse-oxygen level had plummeted to a dangerous level. JA284:14–16, 22–23. His lips and fingernails were blue. JA284:16, 284:24–285:4. The nurse provided oxygen to Mr. Moreno and called Dr. Bosholm, who had returned to work that morning. By now he was vomiting, and his head ached. JA284:1–3.

Dr. Bosholm then examined Mr. Moreno for the first time. She listened to his heart and lungs and measured his blood-oxygen level. JA445:8. Mr. Moreno's blood-oxygen level was life-threateningly low. JA286:5–8, 287:19:21. He was rushed to the hospital, where he had a seizure and fell into a coma that lasted for several weeks. JA288:22–25, 293:12–21.

Hospital staff diagnosed Mr. Moreno with H1N1—Swine flu—a particularly lethal strain. JA294:7–8. They cut open his trachea and installed a ventilator. JA293:12–21, 296:20–25, 489:22–23. They saved him from death, but the flu had caused lasting injury to his eyes, kidneys, liver, pancreas, and prostate. JA288:25–289:3, 295:9–297:16. He had "damage to his pancreas causing diabetes, damage to his kidneys causing kidney failure so that he needed dialysis to keep him alive," and

"injury to his liver." JA288:21–289:3. He was diagnosed with stage 1 kidney disease, nearsightedness, a fungal infection, prostate issues, and diabetes. JA295:9–296:18.

The flu also did lasting damage to Mr. Moreno's memory. When he eventually awoke from his coma, he could not recognize his own mother. JA380:21–381:8. He now suffers from severe memory loss and has little recollection of the days prior to his coma. JA378:22–23. He additionally suffered a contracture in his left ankle and "foot drop," meaning his foot folds inward abnormally and is unusable for walking. JA297:1–15. Mr. Moreno was still relegated to a wheelchair at trial seven years later. JA379:17–19.

Mr. Moreno's post-release plans for moving to Mexico to take care of his aging parents have vanished. JA391:4–11. He cannot work or enjoy his hobbies, such as playing soccer. JA379:17–19, 390:3–4. He feels as though his life is "over." 390:12–13.

Years after the incident, he gained access to his medical records, learned the details of his treatment at Scotland Correctional, and filed this lawsuit. JA383:25–384:8.

## PROCEDURAL HISTORY

Mr. Moreno filed this suit pro se in the United States District Court for the Middle District of North Carolina on April 1, 2019. JA1. The district court appointed counsel for Mr. Moreno, who appeared on December 13, 2019. JA7–8. Mr. Moreno filed an amended complaint on March 16, 2019. JA34–65. The Amended Complaint alleged claims against 24 defendants, including Dr. Bosholm. *Id.* The remaining 23 defendants were dismissed, settled, or defaulted. Dr. Bosholm is the only defendant relevant to this appeal.

4861-6412-4818.v8

Mr. Moreno alleged two claims against Dr. Bosholm: deliberate indifference in violation of the Eighth Amendment, brought pursuant to 42 U.S.C. § 1983, and state common law negligence and gross negligence. JA55–61. Dr. Bosholm moved to dismiss the amended complaint. JA66–69. Magistrate Judge Patrick Auld recommended on August 25, 2021, that Dr. Bosholm's motion be denied. JA70–114. District Court Judge Loretta Biggs adopted Judge Auld's recommendation and denied Dr. Bosholm's dismissal motion on September 29, 2021. JA115–16. After discovery, Dr. Bosholm moved for summary judgment. Judge Auld recommended that Dr. Bosholm's motion be granted in part and denied in part on June 12, 2023. JA139–204. Judge Biggs adopted Judge Auld's recommendation on July 21, 2023. JA205.

Prior to trial, Dr. Bosholm filed a motion in limine. JA206–215. Dr. Bosholm argued that Mr. Moreno's expert witness, Dr. Robert Bilbro, was not qualified under North Carolina's rules of evidence to testify as to the relevant medical standard of care that applied to Dr. Bosholm. JA207. The district court granted this portion of Dr. Bosholm's motion in limine on July 21, 2023. JA223–26. Applying North Carolina rules of evidence, the district court reasoned that Dr. Bilbro was not qualified to opine on the relevant standard of care. *Id.* Mr. Moreno moved the court to reconsider its ruling on Dr. Bosholm's motion in limine on July 23, 2023. JA245–46.

A jury trial in this case was held from July 25–27, 2023. JA247–532. The district court first addressed Mr. Moreno's motion for reconsideration. JA249:6–11. Mr. Moreno argued that federal rules of evidence, not state rules, govern whether Dr. Bilbro could offer expert testimony in federal court. JA249:21–250:3. Alternatively,

Mr. Moreno argued that Dr. Bilbro was qualified under North Carolina law. JA250:4–18. The district court denied Mr. Moreno's motion to reconsider. JA255:17–19. Again applying North Carolina law, it prohibited Dr. Bilbro from testifying on the applicable standard of care. JA255:19–JA256:7.

During the trial, the court sustained Dr. Bolshom's objections to Dr. Bilbro's testimony and prevented him from offering opinions on (1) what would have prevented Mr. Moreno's health conditions, (2) what additional steps should have been taken when treating Mr. Moreno, (3) who was responsible for the medical treatment that Mr. Moreno received, and (4) whether, in Dr. Bilbro's medical opinion, Mr. Moreno's medical conditions were caused by the events of February 26 and 29, 2016. JA275:23–276:3; 297:22–298:15. Dr. Bilbro then proffered testimony outside the jury's presence. JA315:23–319:9.

Mr. Moreno called four additional witnesses after Dr. Bilbro, including Dr. Arthur Campbell, chief medical officer for the North Carolina Department of Adult Correction, JA324:13–334:19; Joshua Panter, the department's director of operations, JA335:1–353:14; Victoria Ramsey, a nurse practitioner at Scotland Correctional Institution, JA354:6–363:17; and Ms. Sullivan, the lead nurse who first evaluated Mr. Moreno on February 26, 2016, JA363:25–376:25. Mr. Moreno then testified. JA377:10–392:19. Finally, Mr. Moreno's trial attorney read an interrogatory response from Dr. Bolshom to the jury. JA393:22–394:5.

After Mr. Moreno rested, Dr. Bosholm moved for judgment as a matter of law. JA395:1–3. The trial court took Dr. Bosholm's motion under advisement. Dr. Bosholm

then recalled Dr. Arthur Campbell, JA419:11–433:25, testified herself, JA434:4–453:4, and called her expert witness, Dr. Chad Zawitz, JA457:24–516:3.

At the close of all evidence, Dr. Bosholm renewed her motion for judgment as a matter of law. JA516:18–518:10. The trial court granted Dr. Bosholm's motion. JA518:25–519:6. It held that insufficient evidence supported Mr. Moreno's claims for deliberate indifference or negligence and gross negligence. JA519:7–531:2.

The district court entered judgment dismissing Mr. Moreno's remaining claims on August 3, 2023. JA533. Mr. Moreno timely appealed the district court's ruling pro se on September 2, 2023. JA534–35. Dr. Bosholm cross-appealed the denials of her motions to dismiss and for summary judgment on September 18, 2023. JA536–39. This Court consolidated Mr. Moreno's appeal and Dr. Bosholm's cross appeal on October 23, 2023. JA541.

## STANDARD OF REVIEW

### I. Exclusion of Expert Testimony

A district court's decision to limit an expert's testimony is reviewed for abuse of discretion. *Belville v. Ford Motor Co.*, 919 F.3d 224, 233 (4th Cir. 2019). Application of the wrong legal standard is "necessarily" an abuse of discretion. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990). A trial court's erroneous limitation of expert testimony requires a new trial unless the error was harmless. *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 284 (4th Cir. 2021). An error will be deemed harmless only when the appellate court has "fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.*

4861-6412-4818.v8

## II.    Judgment as a Matter of Law

Denial of a motion for judgment as a matter of law is reviewed de novo. *Mathis v. Terra Renewal Servs., Inc.*, 69 F.4th 236, 242 (4th Cir. 2023). A motion for judgment as a matter of law should be denied unless "a party has been fully heard on an issue" and "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In ruling on a motion for judgment as a matter of law, courts "must not weigh evidence, determine witness credibility, or substitute judgment of the facts for that of the jury," and must "view[ ] the facts and draw[ ] all reasonable inferences from them in favor of the nonmoving party." *Mathis*, 69 F.4th at 242.

## SUMMARY OF THE ARGUMENT

The Federal Rules of Evidence govern whether a witness can offer expert testimony in federal court. Accordingly, the district court erred by excluding Dr. Bilbro's testimony on state law grounds.

That error was not harmless. Dr. Bilbro's testimony was the key piece of evidence establishing that (1) Dr. Bolshom breached the duty of care owed by physicians to their patients when she failed to leave any instruction on how to monitor Mr. Moreno's condition, and (2) Dr. Bolshom's inaction caused Mr. Moreno's debilitating injuries. On this basis alone, Mr. Moreno is entitled to a new trial.

But even without Dr. Bilbro's testimony, sufficient evidence existed to sustain Mr. Moreno's claims. Both claims could be satisfied by a showing that Dr. Bosholm had actual knowledge that her inaction posed a serious and unnecessary risk to her patient's health, but nevertheless chose not to act.

Here, Dr. Bolshom knew on February 26 that Mr. Moreno had a serious flu-like respiratory illness and suspected that he had the flu. Dr. Bosholm likely knew from her training and experience that respiratory illnesses like the flu can cause crippling damage throughout the body by preventing the patient from inhaling sufficient oxygen, and that the best way to avoid oxygen loss in a patient suffering from a flu-like illness is to regularly check his respiration and oxygen levels by listening to his lungs and measuring his blood's oxygen content. Dr. Bosholm knew that Mr. Moreno was particularly at risk of harm because his breath rate was already abnormally high.

Dr. Bosholm further knew that if she ordered nurses to monitor Mr. Moreno's respiration as part of her treatment plan, they would do so. And she understood that, without such instruction, the nurses would default to prison quarantine protocols. Based on the admitted evidence, these protocols only required nurses to quickly check patients' temperatures, not check respiration. Dr. Bosholm testified that she was aware of these protocols. A reasonable jury could therefore infer that Dr. Bosholm understood that, unless she instructed them differently, the nurses would not monitor Mr. Moreno's respiration, putting him at a serious and unnecessary risk of harm.

Despite this knowledge, Dr. Bosholm did not take the thirty-seconds necessary to jot down instructions for the nursing staff to monitor Mr. Moreno's respiration. Late on a Friday evening, Dr. Bosholm instead signed off on the nurse's report and signed out for the weekend. Although she could have called in to check on Mr. Moreno's condition at any time, she chose not to do so. Nor did she check on him

14

Monday morning when she returned to work. Instead, she waited until Mr. Moreno's condition had deteriorated to life-threatening levels before providing any meaningful care.

Based on these facts, a reasonable jury could find that Dr. Bosholm's complete abdication of her basic responsibilities as a doctor constituted deliberate indifference and negligence.

## ARGUMENT

### I. The District Court Erred By Limiting Dr. Bilbro's Testimony.

#### A. The district court erred by applying state evidentiary rules.

North Carolina law imposes numerous barriers to expert testimony in medical malpractice actions. One of these is the requirement that an expert must have devoted the majority of his professional time to either active clinical care or teaching during the year preceding the event in question. N.C. R. Evid. 702(b). Another is that the expert must be personally familiar with the experience and training of the defendant. *Smith v. Whitmer*, 159 N.C. App. 192, 196–97, 582 S.E.2d 669, 672–73 (2003).

The district court in this case relied on these two state law restrictions to limit Dr. Bilbro's testimony. *See* JA201 (citing *Smith*, 159 N.C. App. at 196–97, 582 S.E.2d at 672–73); JA225–26 (citing JA220); JA255:17–256:7 (citing JA201 and N.C. R. Civ. P. 702(b)). Accordingly, Dr. Bilbro was not allowed to offer testimony on (1) the standard of care applicable to Dr. Bosholm, (2) whether Dr. Bosholm breached that standard, or (3) whether Dr. Bosholm's breach caused Mr. Moreno's injuries.

15

However, it has been conclusively established in this Circuit—and, it appears, every circuit to have considered the issue—that "the admissibility of expert testimony in a federal court . . . is controlled by federal law," not state law. *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1054 (4th Cir. 1986) (citing *Krizak v. W.C. Brooks & Sons, Inc.*, 320 F.2d 37, 41 (4th Cir. 1963)); *see also Sarkees v. E. I. DuPont de Nemours & Co.*, 15 F.4th 584, 588 (2d Cir. 2021) (collecting cases from other circuits). "State law, whatever it may be, is irrelevant." *Scott*, 789 F.2d at 1054.

This is true for claims arising under federal law, such as for deliberate indifference under the Eighth Amendment. *See Scinto v. Stansberry*, 841 F.3d 219, 230 (2016) (holding that "the Federal Rules of Evidence apply" to expert testimony in deliberate indifference cases). This is also true for state law claims litigated in federal court. *See Scott*, 789 F.2d at 1054 (holding that federal courts must apply the federal rules of evidence to expert testimony while sitting in diversity).

Federal rules supplant state rules in this instance because Rule 702 of the Federal Rules of Evidence and the Supreme Court's landmark opinion in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)—itself a diversity case—directly address whether a witness may offer expert testimony. Because the "situation is covered by one of the Federal Rules," the Federal Rule applies in federal court. *Hanna v. Plumer*, 380 U.S. 460, 471 (1965). Indeed, because the Federal Rules of Evidence "were enacted directly by Congress, their validity vis-à-vis state law . . . stands on ground even firmer than that of the Federal Rules of Civil Procedure." *Sarkees*, 15

4861-6412-4818.v8

F.4th at 588 (quoting 19 Charles A. Wright & Arthur R. Miller et al., *Federal Practice & Procedure* § 4512 (3d ed. 2021)).

The district court therefore erred when it applied state law, rather than federal law, to evaluate the admissibility and limit the scope of Dr. Bilbro's testimony.

## B. The district court's error was not harmless.

As stated, a district court's application of the wrong legal standard to erroneously exclude expert testimony requires a new trial unless the appellate court has "fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Sardis*, 10 F.4th at 284. No such assurance can be had in this case. Had the district court applied the correct legal standard, it could have (and likely would have) admitted Dr. Bilbro's testimony. Further, had his testimony been admitted, the jury would have had sufficient evidence to find Dr. Bosholm liable.

### i. Dr. Bilbro's testimony was admissible under the federal rules.

Had the district court applied the correct rule of evidence, Dr. Bilbro's testimony would likely have been admitted. First, Dr. Bolshom did not challenge Dr. Bilbro's testimony under Federal Rule 702. She therefore waived any challenge to his testimony under the federal rules, and Dr. Bilbro's expert testimony would have been admitted.

Second, unlike North Carolina's Rule 702, the Federal Rules of Evidence do not contain rigid hurdles for medical experts. Under Rule 702, expert testimony must be admitted if the witness is qualified as an expert by knowledge, skill, experience,

training, or education, and "the proponent demonstrates to the court more likely than not that:"

    (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b)    the testimony is based on sufficient facts or data;

    (c)    the testimony is the product of reliable principles and methods; and

    (d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. A district court "is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No II)*, 892 F.3d 624, 631 (4th Cir. 2018).

Here, the parties agree that Dr. Bilbro is qualified by his education, training, and nearly 40-year career as an expert in internal medicine, and the district court qualified him as such.[2] JA267:4–18. Based on that knowledge, skill, experience, training, and education, Dr. Bilbro could appropriately testify to the standard of care applicable to doctors treating patients with flu-like symptoms in the region in which

---

[2] Dr. Bilbro is a licensed physician with undergraduate and medical degrees from the University of North Carolina at Chapel Hill. He completed his internship and residency at Parkland Hospital in Texas, served in the military, completed a second residency at UNC Hospitals, and completed a cardiology fellowship at Duke Hospital before going into private practice. He worked in private practice as an expert in internal medicine with emphasis on cardiology for 35 1/2 years. He is board certified in internal medicine. Dr. Bilbro has experience diagnosing and treating the flu and pharyngitis, and treating patients in a correctional setting. JA258:15–260:16, JA262:4–266:19.

4861-6412-4818.v8

Dr. Bosholm practices and that Dr. Bosholm breached that standard. JA317:13–318:7. His testimony rested on his review of the medical records from this case, his review of Dr. Bosholm's training and expertise, and the reliable application of his robust experience treating flu patients to those facts. JA266:23–267:3, 268:2–269:10.

At a minimum, there can be no "fair assurance" that the district court, in its discretion, would have excluded Dr. Bilbro's testimony under the federal rules.

### ii.    Dr. Bilbro's testimony would have precluded judgment as a matter of law.

In granting Dr. Bosholm's motion for judgment as a matter of law, the district court repeatedly pointed to a lack of expert testimony to support Mr. Moreno's case. Regarding deliberate indifference, the court held that Mr. Moreno failed to provide admissible expert testimony that "the care provided by Dr. Bosholm was so grossly incompetent that any reasonable juror could find that it rose to the level of deliberate indifference." JA520:24–521:3. Regarding negligence, it held that Mr. Moreno "did not put on any expert witness testimony regarding the standard of care." JA525:8–18. Additionally, it held that Mr. Moreno had failed to provide admissible expert testimony to show that Dr. Bosholm's actions caused his injuries—a necessary element to both of his claims. JA521:7–14, 523:21–24.

Had Dr. Bilbro been allowed to testify on these topics, his testimony—read in context with his admitted testimony—would have filled in the gaps that the district court held were fatal to Mr. Moreno's case.

Regarding the standard of care, Dr. Bilbro's testimony would have established that the standard of care for patients with flu-like symptoms is to regularly check

"how fast was [the patient's] breathing, was his breathing labored; and if so, preferably listen to his lungs, and perhaps measure his blood pressure and his heart rate." JA282:13–24, 317:13–318:7. If the patient is to be monitored by nurses, that standard requires that someone instruct the nurses to regularly check the patient's respiration and blood-oxygen content. JA288:3–6. In the absence of some protocol requiring nurses to check respiration and blood-oxygen content, the duty to leave instructions to that effect falls to the physician. JA288:5–6 (testifying that the direction should have been given by "physician orders"); *see also* JA509:7–9 (Defendant's expert agreeing that physicians have a "duty" to "determine if [a nurse's notes] is enough information for [the doctor] to move forward with what [she] need[s] to do," or whether she needs to ask more questions). Dr. Bilbro would have testified that this standard of care applies to all doctors and is not relaxed for those working in correctional facilities. JA318:8–13; *see also* JA504:22–25 (Defendants' expert agreeing that the standard of care for treating flu-like illnesses is similar "regardless of the setting").

Dr. Bilbro would have also testified that, according to the medical records, Dr. Bosholm breached this standard of care. JA318:14–22. She was Mr. Moreno's only treating physician. *See* JA275:18–23 ("Dr. Bosholm . . . was the physician in charge."). She left no meaningful instructions whatsoever related to Mr. Moreno's flu-like illness as part of her treatment plan. JA287:22–288:2. She never instructed the nurses treating Mr. Moreno to listen to his lungs, measure his breathing, or test his pulse oxygen level. *Id.*

4861-6412-4818.v8

Dr. Bilbro further would have established that Dr. Bosholm's breach caused Mr. Moreno's injuries. Flu-like illnesses can restrict a patient's breathing, causing reduced blood-oxygen levels, which in turn can cause innumerable crippling injuries. JA275:3-8, 287:16–21. The best way to avoid these injuries is to monitor the patient's respiration and blood-oxygen levels. JA288:3–6. Dr. Bosholm's failure to include basic instructions in her treatment plan meant that no nurse monitored Mr. Moreno's respiration and blood-oxygen content between his initial evaluation on February 26th and his subsequent evaluation on February 29th. JA282:8–11, 346:7–13, 350:5–15, 351:2–14.

By 2:33PM on February 29th, Mr. Moreno's pulse oxygen level had become life-threatening. JA285:14–286:7. Dr. Bilbro testified that Mr. Moreno's pulse oxygen level likely did not drop precipitously "all of a sudden." JA287:7–21. It likely had begun to drop on February 28th when he reported trouble breathing. *Id.* Thus, had a nurse measured Mr. Moreno's pulse oxygen level on February 27th and 28th, Dr. Bilbro testified that the nurse likely would have identified the decline and provided oxygen as a treatment. JA288:5–14.

Dr. Bilbro testified that Mr. Moreno's low oxygen level caused significant damage to his brain, pancreas, kidneys, and liver. JA288:21–289:3. Administering oxygen to Mr. Moreno sooner "would have prevented" these injuries. JA288:21–289:3. The damage to Mr. Moreno's brain, kidneys, pancreas, and liver, his seizure, and his coma "were all preventable." JA275:3-8; *see also* 287:16–21, 288:5–14 ("[A]ll of these problems that happened with him could have been avoided."). Thus, Dr. Bilbro would

have testified that the "limited care" that Mr. Moreno received as a consequence of Dr. Bosholm's failure to adequately order that his respiration be monitored caused his injuries and almost caused his death. JA276:3-8.

As discussed below, the jury already had enough evidence to find that Dr. Bosholm exhibited deliberate indifference. Dr. Bilbro's testimony would have strengthened this evidence. To show negligence, Mr. Moreno needed to show that Dr. Bosholm did not act in accordance with the applicable standard of care. *Turner v. Duke Univ.*, 325 N.C. 152, 162, 381 S.E.2d 706, 712 (1989). Dr. Bilbro's testimony regarding what a reasonable physician with Dr. Bosholm's training and experience should have done strengthened other evidence that Dr. Bosholm breached her duty of care. To show deliberate indifference, Mr. Moreno needed to show that Dr. Bosholm subjectively knew that her inaction could pose a serious risk of substantial harm to his health. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). Dr. Bilbro's testimony regarding what a reasonable physician would have known would also have bolstered the reasonable inference that Dr. Bosholm *did* know that failing to leave such instructions was seriously risky. *C.f. id.* (holding that actual knowledge of a risk can be inferred from the fact that a "reasonable man would realize it"). Finally, Dr. Bilbro's more detailed testimony about how Mr. Moreno's injuries were caused would have given the jury more reason to find that Dr. Bosholm's deliberate indifference and negligence caused Mr. Moreno's injuries.

## III.  The District Court Erred in Granting Judgment As A Matter of Law.

Even without Dr. Bilbro's testimony, Mr. Moreno's evidence was sufficient to get his claims to the jury. He produced sufficient evidence from which a reasonable

jury could find that Dr. Bosholm responded to his serious medical needs with deliberate indifference and gross negligence.

A. **A reasonable jury could have concluded that Dr. Bosholm's wholly inadequate response to Mr. Moreno's serious medical condition constituted deliberate indifference.**

Prisoners have a fundamental Eighth Amendment right to be free from deliberate indifference to their serious medical needs. *Farmer*, 511 U.S. at 828; *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Prison officials have a constitutional duty to "ensure that inmates receive adequate . . . medical care" and must "take reasonable measures to guarantee" inmates' health and safety. *Scinto*, 841 F.3d at 225 (quoting *Farmer*, 511 U.S. at 832); *Cox v. Quinn*, 828 F.3d 227, 235 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 832). They violate this constitutional duty if they, "acting with deliberate indifference, expose[ ] a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" *Farmer*, 511 U.S. at 843 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).

Deliberate indifference has two elements: an objective element and a subjective element. *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). First, the injuries suffered "must be, objectively, sufficiently serious." *Cox*, 828 F.3d at 235. Second, the official must have had subjective knowledge that her inaction posed a "substantial risk of serious harm." *Farmer*, 511 U.S. at 842.

i. **Mr. Moreno had an objectively severe medical condition.**

For purposes of the objective element of deliberate indifference, injuries are sufficiently serious if they result in "a serious or significant physical or emotional

injury" or create a "substantial risk of such serious harm resulting from . . . exposure to the challenged conditions." *Scinto*, 841 F.3d at 225. In a medical needs case, this test requires evidence that the plaintiff suffered a "serious medical need." *Id*.

Here, there is no question that Mr. Moreno suffered an objectively serious deprivation. He caught swine flu—a particularly dangerous strain of a lethal virus.[3] Both experts at trial testified that the flu, if left untreated, can lead to death or serious injury. JA275:3-8, 287:16–21, 488:24–489:9 (Dr. Bosholm's expert testifying that the flu can lead to sepsis, an "overwhelming immune response" that causes "blood pressure dropping precipitously," the lungs to fill with fluid, and oxygen to become hard to deliver, even when the patient is on life support). And that is what happened: Mr. Moreno suffered sepsis, a seizure, kidney failure, liver failure, and memory loss; fell into a coma; developed diabetes; lost use of one foot; and is limited to a wheelchair.

The fact that Mr. Moreno had not yet sustained these injuries when Dr. Bosholm first reviewed his chart on February 26 is irrelevant for purposes of the required analysis. *See Farmer*, 511 U.S. at 845 (holding that a "life-threatening condition" constitutes an objectively serious deprivation even if no "tragic event" has yet occurred). An inmate can suffer a serious medical condition even if his symptoms were mild or managed at the time of the deliberate indifference if depriving him of adequate medical care would pose a substantial risk to his health. *See, e.g., Scinto*,

---

[3] In 2016-2017, the flu hospitalized 500,000 Americans and killed 38,000. Centers for Disease Control and Prevention, *Past Seasons Estimated Influenza Disease Burden* (Nov. 22, 2023), https://www.cdc.gov/flu/about/burden/past-seasons.html.

4861-6412-4818.v8

841 F.3d at 228 ("Leaving a diabetic . . . without proper food or insulin when it is needed creates an objectively, sufficient serious risk of harm."). That is the case here—Dr. Bosholm's conduct allowed Mr. Moreno's condition to deteriorate, causing serious injury.

      **ii.**      **The jury could have inferred that Dr. Bosholm subjectively knew that her conduct posed a serious and unnecessary risk to Mr. Moreno's health.**

Regarding the subjective element, "the defendant prison officials must have had a 'sufficiently culpable state of mind.'" *Cox*, 828 F.3d at 236 (*Farmer*, 511 U.S. at 834). An official has a sufficiently culpable state of mind if she "knew of and disregarded an excessive risk to inmate health or safety." *Scinto*, 841 F.3d at 225 (cleaned up); *Farmer*, 511 U.S. at 837. The official need not have "believ[ed] that harm actually would befall an inmate," so long as she had "knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. A plaintiff must produce evidence from which a reasonable jury can infer that (1) the official knew of the inmate's serious medical condition, and (2) knew that her inaction posed an "excessive risk" to the prisoner. *Scinto*, 841 F.3d at 226.

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact" for the jury that can be inferred "from circumstantial evidence" or "the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

Here, a reasonable jury could have inferred that Dr. Bosholm knew of Mr. Moreno's serious medical condition. Dr. Bosholm suspected that Mr. Moreno had the flu and ordered that he be housed in close proximity with prisoners who had tested

positive for the flu in a quarantine designed to limit the spread of the flu to the quarantined prisoners. A reasonable jury could infer from this evidence that Dr. Bosholm knew that Mr. Moreno had the flu.

Further, as discussed above, both parties' experts testified that the flu, when left unmonitored, can cause death or serious injury. A reasonable jury could have inferred that Dr. Bosholm—a credentialed medical doctor who is board certified in internal medicine—knew that failing to monitor Mr. Moreno's respiration created a serious risk of harm to him. *See Scinto*, 841 F.3d at 230 (holding that a jury could infer that a doctor knew the "well-known fact" that failing to treat diabetes posed a serious risk of injury (cleaned up)).

Moreover, Dr. Bosholm knew from Ms. Sullivan's notes that Mr. Moreno was breathing abnormally rapidly on February 26. Dr. Bilbro testified that this abnormally rapid breathing indicated that Mr. Moreno was struggling to get enough oxygen in each breath and was therefore at a heightened risk of suffering injuries associated with diminished oxygen intake. Again, the jury could have inferred that Dr. Bosholm knew this medical fact and understood that Mr. Moreno was at an even greater risk of suffering the consequences of reduced oxygen intake.

A reasonable jury could also have inferred that Dr. Bosholm knew that her inaction posed an "excessive risk" to Mr. Moreno's health. First, Dr. Bilbro testified that listening to a flu patient's lungs, monitoring his rate of breath, and measuring his blood's oxygen content is a necessary measure to identify respiratory failure and prevent serious harm to the patient. Failure to do so unnecessarily risks death or

serious injury. When Dr. Bosholm finally examined Mr. Moreno on February 29, she did all three of these things, demonstrating that she knew this medical fact.

Second, sufficient evidence supported a reasonable inference that Dr. Bosholm knew that the nurses would not monitor Mr. Moreno's respiration or blood-oxygen level unless she instructed them to do so as part of her treatment plan. Dr. Campbell, the chief medical officer for the North Carolina Department of Adult Correction, testified to the role that a physician's "guidance" plays in a quarantine like the one Dr. Bosholm initiated here. JA427:23–428:5; *see* JA486:15–17 (Dr. Bosholm's expert describing this guidance as Mr. Moreno's treatment "plan"). Dr. Bosholm acknowledged that nurses look to the physician's instructions in administering a quarantine. JA450:20–24.

Dr. Bosholm further understood that, in the absence of physician instructions, the nurses would monitor only what was required by prison quarantine protocols. Dr. Bosholm testified that she was aware of these protocols and expected the nurses to monitor Mr. Moreno in accordance with them. JA447:15–16, 451:5–6. Since she presented no evidence that the nurses deviated from these protocols in monitoring Mr. Moreno's health, the jury could have reasonably inferred that the protocol did not include any requirement that nurses monitor quarantined patients' respiration.

Thus, the jury could have reasonably inferred that Dr. Bosholm knew that monitoring Mr. Moreno's respiration and blood-oxygen level was critical to preventing an unnecessary risk of serious injury, and knew that the nurses monitoring Mr.

Moreno would not provide this critical monitoring without instruction from the only doctor involved in Mr. Moreno's care.

In the face of this known and serious risk, Dr. Bosholm not only failed to leave sufficient instructions—she failed to take *any* of the steps that one would expect a doctor to take in response to complaints of a flu-like illness. Late on a Friday evening, moments before leaving for the weekend, Dr. Bosholm gave Mr. Moreno's chart a brief review. She did not order a flu test, examine him to check for additional flu-like symptoms (such as crackling in his lungs), ask for any additional information, or diagnose him with the flu. Nevertheless, she ordered that he be quarantined with eighteen other inmates, including four confirmed flu cases. She diagnosed him only with a sore throat—and then did not even take the steps that *her own expert* testified she should have taken before making that diagnosis. JA496:4–497:8. She did not prescribe Mr. Moreno any medicine to treat the flu, but instead prescribed him antibiotics (which do not treat the flu). Then she "signed off" on his chart without leaving any meaningful instruction on how he should be monitored and left for the weekend. She did not check in on any of her patients all weekend, nor did she check on Mr. Moreno when she arrived to work Monday morning.

This is not how anyone would expect their physician to behave. As Dr. Bosholm's own medical expert acknowledged, "there are some things that . . . are intrinsic as a doctor that are a part of your job description." JA504:20–22. At Scotland Correctional, as Ms. Sullivan testified, one of those things is to ensure that "nothing"—and no one—falls "through the cracks." JA376:16–18. According to Dr.

Campbell, a prison doctor is expected to "g[i]ve guidance to the nurses on what [i]s expected over the weekend with each of those patients while they [are] on quarantine" and "communicate[ ]" that guidance "to the nurse supervisor." JA427:23–428:5.

Dr. Bosholm totally failed to perform her fundamental, "intrinsic" duty to ensure that Mr. Moreno was properly cared for from February 26–29, despite knowing that her inaction put his health in jeopardy. As a consequence, Mr. Moreno nearly died from inadequate care. JA275:3-8, 287:16–21, 288:5–14, 288:21–289:3. Accordingly, the district court erred by awarding judgment as a matter of law on Mr. Moreno's deliberate indifference claim.

**B.  A reasonable jury could have concluded that Dr. Bosholm acted with gross negligence.**

Negligence requires proof of four familiar elements: duty, breach, causation, and damages. *Griffin v. Blankenship*, 248 N.C. 81, 84–85, 102 S.E.2d 451, 454 (1958). In medical malpractice, a doctor is liable for negligence if the care she provided was not in accordance with the contemporaneous standard of care among doctors with similar training and experience situated in the same or similar communities under the same or similar circumstances. N.C. Gen. Stat. § 90-21.12(a); *see Turner*, 325 N.C. at 162, 381 S.E.2d at 712. Plaintiffs typically establish breach of the standard of care through expert testimony. However, breach can also be shown through evidence of gross negligence—i.e., that the defendant subjectively knew that her inaction posed an unreasonable and unnecessary risk, but took that action anyway. *Weatherford v. Glassman*, 129 N.C. App. 618, 623, 500 S.E.2d 466, 470 (1998).

4861-6412-4818.v8

Like deliberate indifference under federal law, gross negligence under North Carolina law requires evidence of "conduct done with conscious or reckless disregard for the rights and safety of others." *F.D.I.C. ex rel. Coop. Bank v. Rippy*, 799 F.3d 301, 315 (4th Cir. 2015) (applying North Carolina law); *see Ray v. N.C. Dep't of Transp.*, 366 N.C. 1, 13, 727 S.E.2d 675, 684 (2012) ("Though the test for gross negligence turns on the totality of the circumstances, two factors are especially relevant—purposeful conduct and disregard for the safety of others.").

Whether conduct rises to the level of gross negligence is a question of fact generally left to the jury. *Ray*, 366 N.C. at 13, 727 S.E.2d at 684; *Smith v. Stepp*, 257 N.C. 422, 425, 125 S.E.2d 903, 906 (1962).

As shown above, had Dr. Bilbro been allowed to testify, he would have demonstrated that Dr. Bosholm breached the applicable standard of care. But even without Dr. Bilbro's testimony, the jury had sufficient evidence to reasonably conclude that Dr. Bosholm knew that her inaction posed a substantial risk to Mr. Moreno's health but chose not to act anyway, causing severe harm. *See supra* at 23–27. Mr. Moreno should have been permitted to pursue his state law claim on a gross negligence theory even without Dr. Bilbro's testimony, and the district court erred in granting judgment as a matter of law on this claim.

In sum, the jury heard sufficient evidence from which it could reasonably find Dr. Bosholm liable on Mr. Moreno's federal and state law claims, even without Dr. Bilbro's excluded testimony. Thus, the district court erred in awarding judgment as a matter of law to Dr. Bosholm.

4861-6412-4818.v8

## CONCLUSION

Mr. Moreno respectfully requests that this Court vacate the district court's judgment as a matter of law and remand for a new trial.

## REQUEST FOR ORAL ARGUMENT

Mr. Moreno believes oral argument will aid the Court in deciding the issues presented and respectfully requests oral argument.

This the 5th day of February, 2024.

<div style="margin-left: 50%;">

/s/ James W. Whalen
James W. Whalen
jwhalen@brookspierce.com
N.C. State Bar No. 58477
Samuel J. Ervin, IV
servin@brookspierce.com
N.C. State Bar No. 9788
BROOKS, PIERCE, MCLENDON,
 HUMPHREY & LEONARD, LLP
1700 Wells Fargo Capitol Center
150 Fayetteville Street
Suite 1700
Raleigh, NC 27601
Tel. (919) 882-2523
Fax (336) 232-9215

*Counsel for Plaintiff-Appellant*

</div>

4861-6412-4818.v8

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this opening brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 28.1(e)(2)(A)(i) in that it is 8,147 words, including headings, footnotes, and quotations, according to Microsoft's word count tool.

This the 5th day of February, 2024.

Respectfully submitted,


<u>/s/ James W. Whalen</u>
James W. Whalen

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing Brief with the Clerk of Court using the CM/ECF system, thereby providing notice to all attorneys who have appeared in this case.

This the 5th day of February, 2024.

Respectfully submitted,


/s/ James W. Whalen
James W. Whalen